# Richmond

## ALEXANDER LAWRENCE CLAUD V. COMMONWEALTH OF VIRGINIA.
## LEWIS CLAUD V. COMMONWEALTH OF VIRGINIA.

March 4, 1977.

Record Nos. 760487 and 760488.

Present, All the Justices.

*R. R. Ryder,* for plaintiff in error in Record Nos. 760487 and 760488.

*Jerry P. Slonaker, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error in Record Nos. 760487 and 760488.

POFF, J., delivered the opinion of the court.

Sitting without a jury in separate, consecutive trials, the trial judge found Alexander Claud (Alexander) and Lewis Claud (Lewis) guilty of grand larceny of eight hogs owned by Clyde Carraway. By final orders entered December 19, 1975, the judge sentenced the defendants to confinement in the penitentiary for two and four years, respectively, and suspended execution of two years of Lewis's sentence.

Both defendants challenge the sufficiency of the evidence and the competency of certain evidence admitted over objection, and we consider the writs jointly.

We review first the evidence adduced at Alexander's trial. Early on the morning of February 20, 1975, when Carraway went to his "gilt lot" to feed the 10 breeding hogs he kept there, he found that eight were missing. After notifying the sheriff, he drove to J. L. Rose's hog market. In a pen containing five hogs, he identified four of his own, and in another pen containing 40, he found three which he said were his. Rose advised Carraway that the seven he identified were part of a truckload of 11 hogs he had bought from a Richard Claud. Later, in company with the sheriff, Carraway retrieved his eighth hog from a herd of approximately 200 on Alexander's farm.

On February 20, Alexander borrowed a truck from his cousin, Richard Claud, and with the help of a friend, loaded 11 hogs from his farm. He drove the truck to Richard's home and left it there with instructions to sell the hogs and retain part of the receipts in satisfaction of a debt. Rose testified that when Richard arrived at the market, "I said something to the effect, of why you selling these gilts and I think he said because they wouldn't breed." Alexander objected to this testimony as hearsay.

The investigating officers went to the hog market and photographed the seven hogs Carraway had identified. In each pen, these hogs were "together apart from the other hogs" and "separating themselves from the others." At Alexander's farm, the officers found a garden hose near a faucet at the back door of the home and, in the yard, "a scrub mop, a scrub bucket and hog droppings that had been washed out of something onto the ground".

The officers also introduced photographs of tire tracks which they said were made by a vehicle with rear dual wheels on each side, one of which was mounted with a tire whose tread design was different from that of the other three. Another photograph showed the rear dual wheels on a "U-Haul" truck examined "later on in the investigation". The tire tracks were found at Carraway's farm, at Alexander's "loading pen", and in Alexander's yard and "[t]he same tire tracks, the same prints were there in all three of those places with the odd tire in the same place in all three instances." The tracks also matched the tread and placement of the tires on the U-Haul truck. Alexander objected to the testimony of the officers as opinionary.

By stipulation, but with all objections preserved, the evidence adduced at Alexander's trial was admitted at Lewis's trial. The Commonwealth then called a rental agent who testifed that Lewis had rented a U-Haul truck with rear dual wheels on the afternoon of February 19, 1975 and had returned it the next morning before the rental agency opened. The agent said that the truck "was clean, but there was an odor in the back of it. It appeared to have been washed out or hosed out. . . ." Asked to describe the odor, the agent said "it smelled like hog manure".

The investigating officers testified that Lewis told them that, after renting the truck, he had taken his girl friend to a movie and that he "was with the truck the whole time" and no one else had used it.

From the floor of the truck, the officers retrieved "several specimens of what appears to be a mop and some type hairs." These specimens and samples of hair extracted from the stolen hogs were analyzed by Consolidated Laboratories in Richmond. In the absence of the analyst, the certificate of analysis was admitted into evidence. The certificate identified the hairs as hog bristles and stated that the specimen bristles were identical with those extracted from Carraway's hogs. Lewis objected to introduction of the certificate on the ground that such certificates "can be used to show what was found, not opinion".

■ We consider first Alexander's hearsay objection to Rose's testimony that Richard Claud had told him that he was selling the "gilts" because "they wouldn't breed".

When the testimony of a witness concerning an extrajudicial statement declared by another is offered as evidence of the truth

of the thing stated, the credibility of the declarant becomes crucial to the truth-determining process. Since, at the time he uttered the statement, the declarant was not under oath or subject to cross-examination and his demeanor could not be observed by the fact finder, his credibility cannot be tested and the probative quality of his statement cannot be determined. For those reasons, such testimony is subject to the hearsay exclusionary rule. But when a witness testifies to an extrajudicial statement declared by another, and the truth or falsity of the thing stated is not relevant to the determination of the truth or falsity of a fact material to the adjudication of the issues litigated, the credibility of the declarant and the probative quality of his statement are immaterial. Although such testimony may be immaterial and, thus, inadmissible, it is not subject to the hearsay exclusionary rule. *See generally*, 6 Wigmore, Evidence § 1766 (Chadbourn rev. 1976); McCormick, Evidence § 246 (2d ed. 1972).

Rose related a statement he heard. But the truth or falsity of what was stated was not material to the determination of the guilt or innocence of the accused; Richard Claud's stated motive in selling the hogs was utterly irrelevant to the question whether Alexander stole the hogs Richard Claud was selling.[1] Rose's testimony was not, therefore, subject to the hearsay exclusionary rule.

Alexander contends that the testimony of the officers concerning the identity of tire tracks found at three crucial locations was opinionary and was inadmissible because the Commonwealth did not show that the officers were expert witnesses. We disagree.

No special training or expertise is required to determine the diversity or identity of physical objects so common as the tread on automobile tires and the tracks they leave.[2] We see no logic in

---

[1] Alexander's objection was not premised upon irrelevancy.

[2] "The evidence is said to be inadmissible because [the witness] was not shown to have had special training as an expert on tracks made by automobiles. There is no substance in the complaint. No special training is required of a witness to identify the tread of tires as the same exhibited by tire imprints observed on a road. The testimony is founded on fact, it is not the expression of an expert opinion." *State* v. *Scott*, 221 La. 643, 650, 60 So.2d 71, 74 (1952).

*Accord Richardson and Shoop* v. *State*, 221 Ark. 567, 254 S.W.2d 448 (1953); *Collier* v. *Commonwealth*, 303 Ky. 670, 198 S.W.2d 974 (1947). *See also Allcorn* v. *State*, 392 P.2d 66 (Okl. Cr. 1964).

a rule that would exclude the testimony of a lay witness that a common object he saw at one place was identical to or different from one he saw at another place. Like lay testimony identifying handwriting, *see* Fed. Rules Evid. Rule 901(b)(2), 28 U.S.C.A., such testimony is a statement of fact based upon personal observation and, as such, admissible for whatever weight the fact finder cares to give it.

■ Relying upon the familiar rule that, where the evidence is solely circumstantial, the Commonwealth must show an unbroken chain of circumstances establishing guilt to the exclusion of every rational hypothesis of innocence, Alexander contends that the evidence was insufficient to support the judgment because it was insufficient to prove the identity of the stolen property. Carraway's testimony, Alexander says, broke the chain because his claim "to possess the ability to single his hogs out of a group of two hundred or more similar animals" was "not worthy of belief".

Carraway described the eight hogs as "three white gilts", one "white male barrow hog", "three Hampshires, black and white", and one "Durrock, red". "I think I would qualify as a fair hog man," Carraway said, "I have been raising them all of my life, choosing and picking, and I believe I qualify to identify a hog that I feed and cared for for 7 or 8 months. . . ." Carraway conceded that, in color and physical characteristics, his hogs were similar to other hogs of the same breed and that the type of ear clip notches he used was "standard". But he added that "we use a series of notches to correspond to their mothers . . . and then another one in the other ear to show that they are pure breeds". In his opinion, "it would be very hard for anyone to copy them, the system we use, not the type of notch but the system we use". Carraway described the hog found on Alexander's farm as a "white hog with just a few blue dots under his hair", "way past market weight", and "freshly casterated [sic]".

Alexander does not contend that Carraway's testimony was inadmissible but that it was unbelievable. Given the infirmity of our language in general and the vocabulary of the subject matter in particular, it is difficult to verbalize the combination of physical features and mannerisms of animals by which their owner is able to distinguish them from others. The reliability of the identification depends, of course, upon the degree of

familiarity. Alexander's objection goes to the weight of the evidence and to the credibility of the witness, and we cannot say as a matter of law that either the witness or his testimony was unbelievable.

We are of opinion that the evidence was sufficient to prove the identity of the stolen property and that the inferences fairly deducible from the evidence as a whole show an unbroken chain of circumstances establishing Alexander's guilt to the exclusion of every rational hypothesis of innocence.

The same evidence, considered together with the evidence that Lewis rented and used the U-Haul truck whose tires left the incriminating tracks on the night of the larceny, is sufficient to support the judgment against Lewis.

Lewis assigns error to the admission of the certificate of analysis. On appeal, he contends that the analyst's statement that the specimen hairs retrieved from the U-Haul truck were identical to the samples of bristles extracted from the stolen hog constituted an inadmissible opinion. However, it clearly appears from the record that the purpose for which the Commonwealth introduced the certificate at trial was not to establish identity of the specimens and the samples but merely to show that the specimen hairs retrieved from the suspect vehicle were hog bristles. That is a statement of fact as to which the certificate was competent evidence. *Robertson* v. *Commonwealth,* 211 Va. 62, 175 S.E.2d 260 (1970).

Finding no error below, we will affirm the judgments entered against both defendants.

*Affirmed.*